would be clearly erroneous to conclude otherwise.[8]

Accordingly, the judgment of the district court is REVERSED.

HARBERT INTERNATIONAL
ESTABLISHMENT et al.,
Plaintiffs–Appellees,

v.

POWER SHIPPING, etc., et
al., Defendants,

New York Navigation Company, Inc.,
Defendant–Appellant.

Nos. 79–2156 to 79–2161.

United States Court of Appeals,
Fifth Circuit.
Unit B

Jan. 26, 1981.

John S. Rogers, Christopher Hodge Johnson, New York City, George F. Wood, Mobile, Ala., for defendant–appellant in all cases.

A. Clay Rankin, III, Mobile, Ala., Kenneth R. Jacobson, Greensboro, N. C., for plaintiffs appellees in all cases.

Before GODBOLD, TJOFLAT and VANCE, Circuit Judges.

GODBOLD, Circuit Judge:

New York Navigation (N.Y.Nav.) appeals from a judgment awarding nearly $375,000 to appellee Harbert–Howard Companies (Harbert) for damages incurred when six shipments of ductile iron pipe were unloaded from vessels at Abu Dhabi, United Arab Emirates.

In 1975 Harbert entered into a contract with the Water and Electricity Department (WED) of Abu Dhabi for the installation of more than 70 miles of pressurized water pipeline. For this project Harbert purchased approximately 18,000 sections of ductile iron pipe from American Cast Iron Pipe Company (ACIPCO) located in Birmingham, Alabama. ACIPCO agreed to arrange transport of the pipe from Birmingham to Mobile, Alabama, and as Harbert's agent, contracted with Power Shipping Corporation for shipment from Mobile to Abu Dhabi. N.Y.Nav. guaranteed Power Shipping's performance and chartered the six vessels involved in this case; it also hired the loading and discharging stevedores, while Harbert arranged transport of the pipes from the docks to storeyards in Abu Dhabi.

Both parties agree that only undamaged pipes were loaded in Mobile, and each of the vessels issued a clean bill of lading. The voyages were uneventful. At Abu Dhabi, Masaood Shipping Company (hired by appellant) unloaded the pipes onto trucks supplied by Al Fahad Transportation Company (hired by appellee). Tally clerks employed

by Masaood counted the pipes as they were unloaded and noted some damage.[1] Harbert officials present at various times during discharge observed pipes being damaged and complained to Masaood's superintendent that the clerks were not recording all of the damage. But Masaood did not modify either the manner of unloading or the manner of tallying damage.

As the pipes were unloaded they traveled by truck to storeyards. The ride was smooth. Approximately a dozen of the more than 18,000 pipes fell off the trucks en route, but only one was damaged. The pipes were removed from the trucks and stacked in the storeyards by crane. No damage was observed during the truck unloading or in subsequent handling of the pipe in the storeyards. As required by its contract with WED, Harbert officials conducted a cursory inspection of the pipe within two days after each vessel was unloaded, noting those pieces that were damaged so severely that they had to be reordered. The results were compiled in Receiving Cum Damage reports.[2]

As the pipes were removed from the storeyards to be laid it became apparent that some were damaged and had to be repaired before they could be used. The damage consisted primarily of dents in the spigot ends of the pipes and cracks in the cement linings at the spigot ends. Harbert set up a mass production repair operation to saw off the damaged ends of the pipes and repair the cement linings; 1,536 pipes were repaired in this manner.

1. A second set of tallies was compiled by Abu Dhabi customs as the trucks departed from the loading area.

2. These reports did not list all damage to pipes that did not require reorder because the pipes could not be inspected meticulously in the brief time before the reports were due and some damage was not apparent because the pipes were in stacks.

3. As we discuss below, this inherent defect theory was not squarely presented to the district court and was not the subject of findings.

4. § 1303(6) provides in part:
  Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at

Harbert sued N.Y.Nav., Power Shipping, and the six vessels, alleging that the pipe was delivered to the vessels in good condition and discharged in damaged condition. N.Y.Nav. assumed the defense for Power Shipping and the shipowners. After a non-jury trial the district court found for Harbert. The suit was governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. Harbert contended that the damage occurred when Masaood unloaded the pipes at Abu Dhabi and that it far exceeded that recorded by Masaood's tally clerks. N.Y. Nav. conceded that the damage recorded by Masaood's tally clerks occurred at discharge but maintained that damages exceeding that amount occurred after discharge during transport by Al Fahad's trucks and subsequent handling in the storeyards. It also presented evidence that, on this appeal, it contends showed that inherent defects in the cement lining of the pipes contributed to damages incurred during discharge.[3] The district judge found that 90% of the damage was caused by Masaood's practices in unloading the pipes from the vessels.

## I. LACK OF NOTICE AS PRIMA FACIE EVIDENCE OF GOOD DELIVERY.

COGSA provides that failure by the shipper to give notice of damage to the carrier at or near the time of delivery is prima facie evidence of delivery of the cargo as described in the bill of lading, 46 U.S.C. § 1303(6).[4] Harbert did not satisfy the no-

the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

. . . [I]f a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

tice requirements of this provision, but the district judge nevertheless concluded that Harbert had overcome its burden:

> This statute does no more than to raise a presumption of delivery to the consignee in good order and condition, in the absence of proof to the contrary. However, once plaintiffs came forward with sufficient evidence to suggest that the cargo was damaged prior to delivery, this presumption evaporates and has no further effect on the Court's weighing of the evidence as to the amount of damage at the time of delivery.

N.Y.Nav. argues that the district judge applied an erroneous legal standard by failing to give continual weight to the statutory "presumption" when considering evidence relating to the amount of damage. The argument is based on the assumption that where, as here, the carrier conducts tallies at discharge and is willing to admit the amount of damage those tallies reveal, the shipper's lack of notice under § 1303(6) is prima facie evidence that the cargo was damaged only in the amount listed on the tally sheets. While this theory might serve the goal of encouraging shippers to give prompt notice, the language of the statute will not support it.

█ Under § 1303(6), failure to notify the carrier of damage is prima facie evidence that the goods were delivered in the same condition described in the bill of lading, see *Associated Metals & Mineral Corp. v. M/V Rupert De Larrinaga*, 581 F.2d 100, 101 (5th Cir. 1978); *Miami Structural Iron Corp. v. Cie Nationale Belge De I.M.*, 224 F.2d 566, 569 (5th Cir. 1955). Prima facie evidence under § 1303(6) is thus evidence negating the fact of damage prior to discharge, not the amount of damage. Since the pipes were loaded in Mobile with a clean bill of lading, Harbert's failure to give notice constituted prima facie evidence that they were delivered to Abu Dhabi in undamaged condition.

█ When sufficient evidence indicating that the cargo was damaged prior to discharge is introduced, the prima facie evidence under § 1303(6) is accorded no special weight beyond that given other evidence concerning where the damage occurred:

> [Section 1303(6)] is conclusive only where there is no other evidence on the disputed point. Once the plaintiffs come forward with sufficient evidence to suggest that the cargo was contaminated before discharge. a fact issue is created, which the Court must resolve.

*Socony Mobil Oil Co. v. Texas Coastal & International, Inc.*, 559 F.2d 1008, 1012 (5th Cir. 1977). In the instant case, sufficient evidence existed not only to raise a fact issue but to rebut the prima facie evidence. Harbert presented evidence that the pipes sustained considerable damage and that this damage occurred during unloading. N.Y. Nav. admitted damages at discharge in the amount recorded in Masaood's tally sheets. Thus the district judge was not confronted with the issue addressed by § 1303(6)—whether the pipes were damaged prior to discharge. Rather he had to decide what portion of the damage occurred prior to discharge. Although Harbert's failure to give notice was evidence relevant to deciding whether the pipes were damaged prior to discharge in the amount listed in the tallies or the substantially greater amount alleged by Harbert, § 1303(6) had no bearing on that decision, see *Socony Mobil, supra*, 539 F.2d at 1012.

Appellant's reliance upon cases where the shipper failed to overcome the prima facie evidence under § 1303(6) is misplaced. In *Associated Metals*, 381 F.2d at 102, and *Miami Structural Iron*, 224 F.2d at 568, the shippers failed to overcome § 1303(6) because they could only produce evidence that the cargo was damaged at some point but could produce no evidence that the damage occurred prior to discharge. However, where evidence indicating that damage occurred prior to discharge outweighs the prima facie evidence of undamaged delivery, § 1303(6) is exhausted and the district judge must examine the evidence presented by both parties and determine what portion of the damage occurred prior to discharge, *Socony Mobil; Jamaica Nutrition Holdings v. Great Circle Shipping, Inc.*, 433 F.Supp.

1067 (S.D.Ala.1977); *Tuteur & Co. v. The Ittersum*, 162 F.Supp. 788 (E.D.La.1958) affirmed sub nom. *Isbrandtsen Co. v. Tuteur & Co.*, 267 F.2d 310 (5th Cir. 1959).

## II. WHERE THE PIPES WERE DAMAGED.

■ N.Y.Nav. also challenges the finding that 90% of the damage to the pipe occurred prior to discharge. In essence it asserts that even though Harbert presented evidence that the pipes were damaged before discharge this evidence is not inconsistent with the damages recorded on the tally sheets and therefore Harbert's recovery should be limited to those damages.

We review the district judge's determination of where the damage occurred under the clearly erroneous standard, *Socony Mobil; Tupman Thurlow Co., Inc. v. S.S. Cap Castillo*, 490 F.2d 302 (2d Cir. 1974). Harbert presented considerable evidence that the major part of the damage suffered by the pipes was caused by Masaood's unloading practices. Several witnesses observed the unloadings. They testified that Masaood's stevedores, when retrieving pipes in the wings of the hold, tended to drag them across the other pipes without laying dunnage. As a pipe reached the square of the hatch the stevedores occasionally would allow one end to drop and strike against tiers of pipe already in the square. Sometimes the pipes were lifted out of the hold in pairs without taking precautions to prevent them from swinging into each other. Pipes were heard clanging together. On other occasions witnesses observed pipes striking the hatch coaming and being deposited on Al Fahad's trucks in a rough manner. The loading stevedore in Mobile testified that many of these practices were improper and would expose the pipe to a substantial risk of damage.

Appellant does not dispute that Masaood engaged in these practices at least occasionally but contends that resulting damage was reflected in Masaood's tallies. It relies heavily on the testimony of Captain John Dekens, the surveyor who oversaw the discharge. However, Dekens' testimony lends little support to appellant's contention because he instructed the tally clerks to note only major structural damage to the pipes and he, like the tally clerks, was unfamiliar with the physical characteristics of ductile iron pipe. Dekens conceded that he was not attempting to make a detailed notation of all damages to the pipe.

Appellant also suggests that any damages to the pipe in excess of the amount on the tally sheets occurred either on Al Fahad's trucks or in the storeyards. However, witnesses observing transport and unloading of the trucks and subsequent handling in the storeyards testified that they saw no damage inflicted upon the pipes. Moreover, the testimony of Harbert's witnesses indicated that the type of damage suffered by the pipes–particularly dents and breakage of the cement linings in the spigot ends–was unlikely to occur in the forklift operations used by appellee in the storeyards.

We have examined the record, and we are left without a "definite and firm conviction ... that the district court could not permissibly find as it did", *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). We affirm the finding that 90% of the damage to the pipes occurred prior to discharge.

## III. INHERENT VICE OF THE CARGO.

Appellant seeks refuge in § 4(2)(m) of COGSA which exempts carriers from liability for damages stemming from an inherent vice in the cargo.[5] It argues that, assuming the quantity of pipe claimed by appellee was damaged prior to discharge, a portion of that damage was attributable to defective sealcoat covering the cement linings in the spigot ends of the pipes.

---

5. Section 4(2)(m) of COGSA provides:
   Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from–

   .  .  .  .  .

   (m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods ....
   46 U.S.C. § 1304(2)(m).

■ As with the other exceptions to carrier liability listed in § 4(2) of COGSA, the carrier shoulders the burden of proving the defense of inherent vice, *Blasser Brothers v. Northern Pan–American Line*, 628 F.2d 376, 381–82 (5th Cir. 1980); *Horn v. Cia. de Navegacion Fruco, S.A.*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163, 169 (5th Cir. 1963). To avail itself of this defense the carrier must show what portion of the damage is traceable to inherent vice, *Blasser Brothers*, 628 F.2d at 382.

■ The district judge did not explicitly mention the inherent vice defense in his opinion, but we find that N.Y.Nav. has fallen far short of carrying its burden on this defense. Its argument is based entirely on the testimony of W. Harry Smith, an expert hired by WED's consulting engineers to evaluate the pipe system after its completion. He testified that his inspection revealed that the sealcoat had begun to disbond from the cement lining of some of the pipes. Smith attributed the defective sealcoat to three causes: improperly applied sealcoat in the spigot end of the pipe, extended storage in the sweltering climate of Abu Dhabi, and the presence of stagnant, heavily chlorinated water within the pipe for nearly two years after installation. He then testified that defective sealcoat could affect the lining of the pipe and added that if the cement lining were affected the pipe would be more easily damaged when handled.

Smith's testimony failed to establish inherent vice for several reasons. Of the three causes for the defective sealcoat, only the first—improperly applied sealcoat—related to inherent vice, and Smith made no attempt to estimate the proportion of the pipes that suffered from sealcoat improperly applied at the foundry. Moreover, Smith never gave as his opinion that the sealcoat problem contributed to the cement lining

damage suffered by the pipes prior to discharge. He merely speculated that defective sealcoat could affect the cement lining.[6] Since Smith could draw no link between the defective sealcoat and the cement lining damage and since he did not estimate the portion of the cargo that suffered from defective sealcoat, the inherent vice defense fails. *See Blasser Brothers, supra*, 628 F.2d at 382–84.

N.Y.Nav.'s arguments that Harbert failed to mitigate damages during its repair operations and failed to apportion the damages among the six vessels that carried the pipe are without merit.

AFFIRMED.

---

6. Even if Smith's testimony rose to the level of sufficiency as an opinion and thus indicated that the pipes were more susceptible to damage when handled, it would leave unexplained why little or no damage occurred when the pipe was loaded at Mobile.