**PACIFIC EMPLOYERS INSURANCE COMPANY, et al.,**
**Plaintiffs-Appellees,**

v.

**The M/V GLORIA, etc., Defendants,**

**AQUARIUS, LTD., et al.,**
**Defendants-Third Party**
**Plaintiffs-Appellants,**

v.

**GREENWICH MARINE, INC., Third Party Defendant-Appellee.**

No. 84–3135.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1985.

Terriberry, Carroll & Yancey, M.D. Yager, New Orleans, La., for defendants-third party plaintiffs-appellants.

Lemle, Kelleher, Kohlmeyer & Matthews, W.E. Noel, Heather A. Dolins, New Orleans, La., for Pacific, et al.

Gelpi, Sullivan, Carroll & Laborde, Robert P. McCleskey, Jr., New Orleans, La., for Greenwich.

Before THORNBERRY, REAVLEY and HIGGINBOTHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

This case arises out of a shipment of bagged soybean meal from New Orleans, Louisiana, to Puerto Limon, Costa Rica. When the cargo arrived in Puerto Limon, tallies of the cargo showed that some of the bags were wet, some torn and slack, and some shortlanded. Plaintiffs-appellees brought two admiralty actions under the Carriage of Goods by Sea Act, 46 U.S.C. § 1300, et seq. (West 1975) ("COGSA"), in which they sought to recover for the cargo damage, slackage, and shortage. The district court consolidated the two actions. The plaintiffs were: Cargill, Inc. ("Cargill"), the shipper of the cargo; Ternerina, S.A., Central Agricola De Cartago, S.A., Fabrica De Alimentos Para Animales, and Industria National De Alimentos Gibbons, S.A., the Costa Rican consignees and receivers of the cargo; and Pacific Employers Insurance, the cargo underwriter. Pursuant to a stipulation of the parties, Pacific Employers Insurance was subrogated to the rights of the owners of the cargo.

The plaintiffs sought recovery against the M/V GLORIA, Aquarius, Ltd., and Transportacion Maritima Mexicana, S.A. The defendant M/V GLORIA is a three-hatch bulk and general cargo vessel of Liberian registry owned by the defendant Aquarius, Ltd. ("Aquarius"). The GLORIA was under a long-term time charter to the defendant Transportacion Maritima Mexicana, S.A. ("TMM").

For the voyage in issue, TMM entered into a voyage charter with Greenwich Marine, Inc. ("Greenwich"), a subsidiary of plaintiff Cargill. Greenwich was not an original defendant in the action but was tendered as a party defendant by Aquarius and TMM pursuant to Fed.R.Civ.P. 14(c). Aquarius and TMM also filed third-party actions against Greenwich seeking contribution and indemnity.

Cargill entered into contracts to sell soybean meal to certain parties in Costa Rica. Pursuant to these contracts Cargill engaged Greenwich to find a vessel to carry the soybean meal from New Orleans to Puerto Limon, Costa Rica. Greenwich then entered into a voyage charter of the M/V GLORIA for this purpose. Loading of the bagged soybean meal began in New Orleans on August 5, 1980. Rogers Terminal and Shipping Corp. ("Rogers Terminal") was responsible for bagging, clerking, tallying, and stowing the cargo. Rogers Terminal completed stowage on August 11, and seven bills of lading covering the cargo were issued by "ROGERS TERMINAL & SHIPPING CORPORATION, AS AGENTS BY AUTHORITY OF THE MASTER." Each bill of lading indicates that the cargo was being shipped in apparent good order by Cargill, shipper's weight, quantity and quality, unknown. Further, each bill of lading incorporated the terms of the voyage charter party and the provisions of the Carriage of Goods by Sea Act. Cargill subsequently negotiated the bills of lading.

The GLORIA sailed from New Orleans on August 11 and arrived in Puerto Limon

on August 16. Tallies of the cargo conducted by employees of the Puerto Limon Port Authority (the Japdeva) disclosed that the discharged cargo contained wet and torn bags and that the cargo was slack and short. Subsequently, the owners of the cargo and the cargo underwriter, as subrogee, brought this action to recover for the alleged damage, slackage, and shortage. Only the cargo carried under bills of lading 1, 2, 3, 5, and 7 is at issue in this litigation.

The defendants-appellants, Aquarius and TMM, brought Greenwich into the action as a defendant to the main demand and as a third-party defendant to their claims for contribution and indemnity. The district court ordered that the third-party action by TMM against Greenwich be stayed pending arbitration as required by the voyage charter party. The parties then agreed to submit the case to the district court on written briefs, depositions, exhibits, and proposed findings of fact and conclusions of law. No oral evidence was taken.

On January 26, 1984, the district court entered judgment in favor of plaintiffs and against the GLORIA, *in rem*, and Aquarius and TMM, *in personam*, in the amount of $59,540.24 plus legal interest from the date of judicial demand. In a written opinion the district court found that the vessel, Aquarius, and TMM were carriers under COGSA and that Greenwich was not a carrier. The court also found that plaintiffs established a *prima facie* case against the carriers for recovery of the cargo damage, slackage, and shortage, and that defendants failed to rebut the plaintiffs' evidence. On February 23, the district court entered an amended judgment dismissing the claims against Greenwich. Aquarius and TMM appeal from the judgment and the amended judgment.

The issues before us are (1) whether the district court erred in entering judgment *in rem* against the M/V GLORIA; (2) whether the district court's findings that Aquarius and TMM were carriers under COGSA and that Greenwich was not a carrier are clearly erroneous; (3) whether the court erred in holding that the carriers were liable to the plaintiffs for the cargo damage, shortage, and slackage; and (4) whether the court erred in dismissing the claims against Greenwich. We vacate the *in rem* judgment because we conclude that the district court did not acquire jurisdiction over the vessel, and we vacate the dismissal of TMM's third-party claim against Greenwich. In all other respects we affirm the judgment and amended judgment of the district court.

## I. THE JUDGMENT IN REM

■ The district court entered judgment *in rem* against the M/V GLORIA. Because we find that the district court did not have the power to exercise jurisdiction over the vessel we vacate that judgment.

The appellees' complaints stated claims for cargo damage against the vessel. At the bottom of the complaints, however, appellees directed as follows: "Please withhold service *in rem* until further notice from attorneys for plaintiffs." The record discloses that no such further notice was given, that no *in rem* process was ever issued, that the vessel was not arrested, and that no answer was filed on behalf of the GLORIA. Further, the record does not disclose any waiver of attachment by Aquarius. In these circumstances, the district court lacked jurisdiction to enter judgment against the vessel *in rem*. *Cactus Pipe & Supply Co., Inc. v. M/V MONTMARTRE*, 756 F.2d 1103 (5th Cir.1985); *Associated Metals & Minerals Corp. v. SS PORTORIA*, 484 F.2d 460, 461–62 (5th Cir. 1973); *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163, 168 n. 2 (5th Cir.1963).

## II. COGSA CARRIERS

■ Plaintiffs may recover under COGSA only from the "carriers" of the cargo. COGSA defines "carrier" to include "the owner or the charterer who enters into a contract of carriage with a shipper." 46 U.S.C. § 1301(a). Accordingly, the plaintiffs must establish that a party defendant executed a contract of carriage. *Associated Metals*, 484 F.2d at 462. COGSA defines a "contract of carriage" as follows:

The term "contract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

46 U.S.C. § 1301(b). The district court found that TMM and Aquarius entered into a contract of carriage with Cargill and thus were carriers under COGSA, and that Greenwich did not enter into a contract of carriage as defined by the Act and thus was not a carrier.

■ Appellants challenge the district court's findings. The findings will not be overturned unless they are clearly erroneous:

> In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous.... A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed."

*Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.,* 432 F.2d 103, 105 (5th Cir.1970) (quoting *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954)). The fact that this case was submitted to the district court without oral testimony does not affect our standard of review:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

> This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Anderson v. City of Bessemer City, North Carolina,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### TMM

■ The bills of lading were issued by Rogers Terminal and were signed: "ROGERS TERMINAL & SHIPPING CORPORATION, AS AGENTS BY AUTHORITY OF THE MASTER." The district court found that in issuing the bills of lading, Rogers Terminal acted as agent for TMM and therefore TMM entered into a contract of carriage. TMM contends that this finding is clearly erroneous. We disagree and hold that there was sufficient evidence before the district court to support its finding. The voyage charter party entered into by TMM and Greenwich was incorporated into the bills of lading and provided, in part, that:

> Owners [TMM] to instruct their New York bank to advise Owners' agents at loading port immediately freight received by cable that freight payment has been received and Owners to instruct their agents to release Bill/s of Lading immediately on receipt of such advice. If release of Bill/s of Lading should be delayed, the Owners shall pay interest at one per cent over the New York Prime Rate on Bill/s of Lading date/s, on the cost and freight value of the cargo from the day on which the freight payment is received by the Owners' New York bank until the day on which the Bill/s of Lading are actually released by the Owners' agents.

The evidence before the district court did not clearly disclose for whom Rogers Terminal acted when it issued the bills of lading. Under the voyage charter party,

Greenwich was obligated to appoint and employ stevedores at the loading port. Rogers Terminal performed stevedoring services in New Orleans. However, the National Cargo Bureau's Certificate of Loading, issued after loading of the GLORIA was completed, stated, "AGENT—ROGERS TERMINAL & SHIPPING CO.—T.M.M. CHARTERING." Moreover, the charter party states that TMM and/or its agents would be responsible for issuance of the bills of lading. The master of the GLORIA testified by deposition that he authorized Rogers Terminal to issue the bills of lading on his behalf. He also testified, however, that it was his belief that Rogers Terminal was acting on behalf of Greenwich.

The district court considered all of the evidence before it, and, relying primarily on the voyage charter party provision that TMM would issue the bills of lading upon payment of freight by Greenwich, the court found that the bills were issued by TMM through its agent, Rogers Terminal. The district court's finding, in light of the conflicting evidence, is not clearly erroneous and we affirm the holding that TMM entered into a contract of carriage with respect to the soybean cargo and is thus a carrier under the provisions of COGSA.

*Greenwich*

The district court held that Greenwich was not a COGSA carrier because Greenwich did not issue the bills of lading and did not otherwise enter into a contract of carriage with Cargill. The court found that "Greenwich acted simply on behalf of the shipper in finding a vessel to carry the cargo and paying the appropriate freight." Greenwich did not enter into a contract that was "covered by a bill of lading or any similar document of title." *See* 46 U.S.C. § 1301(b).

In addition to contending that Greenwich issued the bills of lading, appellants argue that Greenwich is a COGSA carrier because the bills of lading were issued in connection with the voyage charter and because, under the voyage charter party, Greenwich was responsible for loading, stowage, and discharge—duties which COGSA places on the carrier. *See* 46 U.S.C. § 1303(2). First, we note that the voyage charter party merely states, "Charterers to appoint and employ stevedores at loading port/s," and "Charterers/Receivers Stevedores to be employed at discharging port/s." The charter party is not so explicit as appellants would have us believe. Moreover, even if Greenwich bore the responsibility under the voyage charter party for loading, stowage, and discharge, we do not believe this fact, alone, would make Greenwich a COGSA carrier. In *Demsey & Associates v. S.S. SEA STAR,* 461 F.2d 1009 (2d Cir.1972), the time charterer issued bills of lading in connection with a voyage charter. The court held that the time charterer was a COGSA carrier but that the voyage charterer was not. The court further held that the fact that the charter party required the voyage charterer to load, stow, and discharge the cargo created a duty running from the voyage charterer to the time charterer but did not affect the time charterer's obligations under COGSA and did not operate to make the voyage charterer a COGSA carrier. *Id.* at 1018–1019. We agree with the Second Circuit and we affirm the district court's finding that Greenwich is not a COGSA carrier.

*Aquarius*

Appellants also argue that the district court erred by finding that Aquarius is a COGSA carrier. Since appellees' causes of action were based on COGSA, there can be *in personam* liability against the vessel owner only if the owner is a carrier. *Associated Metals,* 484 F.2d at 462. Appellants contend that Aquarius did not enter into a contract of carriage and did not become bound by the bills of lading merely because they were signed "by authority of the master."

"A contract of carriage with an owner may either be direct between the parties, or by virtue of a charterer's authority to bind the owner by signing bills of lading 'for the master.'" *Matter of Inter-*

*continental Properties Management, S.A.*, 604 F.2d 254, 258 n. 3 (4th Cir.1979). Appellees argue that the bills of lading were issued by Rogers Terminal—TMM's agent—with the actual authority of the vessel owner and that Aquarius is therefore bound. The circumstances under which the vessel owner may be bound by the bills of lading were well-stated by the First Circuit in *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715 (1st Cir.1984):

> Generally, when a bill of lading is signed by the charterer or its agent "for the master" with the authority of the shipowner, this binds the shipowner and places the shipowner within the provisions of COGSA. *E.g., Gans S.S. Line v. Wilhelmsen (The Themis)*, 2 Cir.1921, 275 F. 254, 262; *Tube Products of India v. S.S. Rio Grande*, 1971, S.D.N.Y., 334 F.Supp. 1039, 1041; *see generally* Bauer, *Responsibilities of Owner and Charterer to Third Parties—Consequences under Time and Voyage Charters*, 49 Tul. L.Rev. 995, 997–1001 (1975). When, however, a bill of lading is signed by the charterer or its agent "for the master" but without the authority of the shipowner, the shipowner is not personally bound and does not by virtue of the charterer's signature become a COGSA carrier. *E.g., Associated Metals and Minerals Corp. v. S.S. Portoria*, 5 Cir. 1973, 484 F.2d 460, 462; *Demsey & Associates, Inc. v. S.S. Sea Star*, 2 Cir.1972, 461 F.2d 1009, 1015.

*Id.* at 719. Aquarius' liability depends on the effect of the signature caption "by authority of the master." In order to determine the effect we must examine Rogers Terminal's authority to sign on behalf of the master and the master's authority to bind Aquarius. *See Yeramex International v. S.S. TENDO*, 595 F.2d 943, 946 (4th Cir.1979).

■ The district court's finding that the master authorized Rogers Terminal to issue the bills of lading on his behalf is not clearly erroneous. The captain of the GLORIA testified by deposition that he "gave Rogers Terminal an undertaking that they should sign the bills of lading."

Appellants presented no conflicting evidence. This case is therefore unlike those cited by appellants in which there was no evidence that the master authorized the charterer or its agent to sign on his behalf. *See Demsey & Associates v. S.S. SEA STAR*, 461 F.2d 1009, 1012–15 (2d Cir. 1972); *Thyssen Steel Corp. v. S.S. ADONIS*, 364 F.Supp. 1332, 1335 (S.D.N.Y.1973); *United Nations Children's Fund v. S/S NORDSTERN*, 251 F.Supp. 833, 838 (S.D. N.Y.1965).

■ We must next determine whether the master had actual authority to bind the vessel owner to the terms of the bills of lading. The charter party between Aquarius and TMM contained the following provisions:

> 8. [T]he Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers [TMM] as regards employment and agency; and Charterers are to load, stow, and trim and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

> Rider 37. If required by Charterers and/or their Agents, Master to authorize Charterers or their Agents to sign Bills of Lading on his behalf in accordance with mates and/or tally clerks receipt with out prejudice to this Charter Party.

We hold that Rider 37 to the charter party empowered the master to authorize TMM's agent to sign the bills of lading and thereby bind Aquarius. The case cited by appellants, *Yeramex International v. S.S. TENDO*, 595 F.2d 943 (4th Cir.1979), is distinguishable. In *Yeramex* the charter party between the vessel owner and the time charterer contained a provision identical to clause 8 above. It also contained a provision that stated, in part: "Charterers shall indemnify Owners from all consequences

arising out of Master or agents signing Bills of Lading in accordance with Charterers' instructions, or from complying with any orders or directions of Charterers in connection therewith." *Id.* at 947. The court in *Yeramex* found that under the provisions of the charter party the charterer assumed exclusive responsibility for handling of cargo and for issuance of bills of lading. The court further stated:

> "In particular, we think all authority conferred by these provisions upon the vessels' masters for bills of lading issued by [time charterer] was authority which flowed, in fact, from [the time charterer] as principal to the masters as its agents, rather than as authority granted to [the time charterer] from the masters as the traditional personal agents of the owner.... No authority in fact existed for [the time charterer] to bind the owner to the terms of the bill of lading as a contracting party, and no liability *in personam* under COGSA will lie against the owner in favor of third parties."

*Id.* at 948. The Aquarius/TMM charter party did not contain a provision requiring TMM to indemnify Aquarius from all consequences arising out of the master or agents signing bills of lading. Moreover, Rider 37 to the charter party contains an express authorization that was not present in the *Yeramex* charter party. The district court's findings that TMM was authorized to bind Aquarius to the terms of the bills of lading and that Aquarius is a COGSA carrier are not clearly erroneous.

## III. COGSA LIABILITY

Appellants contend that the district court erred in holding that appellees met their burden of proving liability for the short, slack, and damaged condition of the cargo.

 Appellants argue first that the district court failed to give effect to COGSA § 1303(6) which states, in part, that:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

46 U.S.C. § 1303(6). Appellants contend that appellees did not give any formal notice of the loss and damage at or near the time of discharge and, as a result, there is a presumption that the cargo left the vessel in the same quantities, order, and condition as stated in the bills of lading. This argument fails to consider this court's prior construction of § 1303(6). The presumption of good delivery established by § 1303(6) "is conclusive only where there is no other evidence on the disputed point." *Socony Mobil Oil Co., Inc. v. Texas Coastal & International, Inc.*, 559 F.2d 1008, 1012 (5th Cir.1977). Once the appellees came forward with sufficient evidence to suggest that the cargo was damaged and short prior to delivery, the presumption disappeared and the evidence of lack of notice "is accorded no special weight beyond that given other evidence concerning where the damage occurred." *Harbert International Establishment v. Power Shipping*, 635 F.2d 370, 373 (5th Cir.1981). The effect to be given to § 1303(6) was concisely stated in *Socony Mobil Oil:*

> Defendants also argue, on the strength of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6) that the failure of Mobil to have given notice of the cargo damage within three days of discharge, is *prima facie* evidence that the goods were discharged in good order. This argument misconstrues the nature of the statute. It is conclusive only where there is no other evidence on the disputed point. Once the plaintiffs come forward with sufficient evidence to suggest that the cargo was contaminated before discharge a fact issue is created, which the Court must resolve. As we have concluded above that the resolution of the fact issue in the instant case was not clearly erroneous, the § 1303(6) 3-day

notice provision has no bearing on the outcome of the case.

*Socony Mobil Oil*, 559 F.2d at 1012. *See also Nissho-Iwai Co., Ltd. v. M/T Stolt Lion*, 617 F.2d 907, 912 n. 4 (2d Cir.1980), *appeal after remand*, 719 F.2d 34, 41 n. 5 (2d Cir.1983); *United States v. Central Gulf Lines, Inc.*, 575 F.Supp. 1430, 1435 (E.D.La.1983). In the instant case the district court found that appellees made a *prima facie* showing that the cargo was wet, short, and slack prior to discharge and that the appellants failed to rebut this evidence. Because we hold, as discussed below, that these findings are not clearly erroneous, the notice provision "has no bearing on the outcome of the case." *Socony Mobil Oil*, 559 F.2d at 1012. We therefore need not decide whether any notice given by appellees was sufficient to comply with § 1303(6).

■ Plaintiffs establish a *prima facie* case for recovery under COGSA by presenting evidence that the "cargo was loaded in undamaged condition and discharged in contaminated condition." *Socony Mobil Oil*, 559 F.2d at 1010. Once a *prima facie* case has been presented, the carrier must prove that it exercised due diligence to prevent the damage or that the harm was occasioned by one of the excepted causes listed in COGSA § 1304(2). *Blasser Bros., Inc. v. Northern Pan-American Line*, 628 F.2d 376, 381 (5th Cir.1980). If the carrier is unable to rebut the shipper's position, the carrier will be liable for the entire damaged cargo unless it can prove what portion was not actually damaged or was damaged under one of the exceptions of § 1304(2). *Id.* at 382. The district court found that appellees met their burden of making a *prima facie* case of liability and that appellants failed to rebut.

*Liability for Damage and Slackage*

■ The bills of lading are *prima facie* evidence of receipt by the carrier of the cargo in the condition and order therein described and create a rebuttable presumption that the goods were delivered to the carrier as described. *Blasser Bros.*, 628 F.2d at 381; 46 U.S.C. § 1303(4). The district court found this presumption was not rebutted. We agree. The GLORIA docked at the Market Street wharf, Port of New Orleans, on August 3, 1980. Commencing August 5, the soybean cargo was loaded aboard the vessel and stowed in her three holds. The cargo had previously been transported to New Orleans in barges as bulk soybean meal. The bulk cargo was unloaded into a shed at the wharf and placed in water resistant bags. Rogers Terminal was responsible for the bagging, clerking, tallying and stowage of the cargo. The captain and the crew of the GLORIA were at all times closely monitoring the stowage to ensure proper distribution within the vessel. Captain Richards, the master of the GLORIA, testified by deposition that he was unaware of any reports indicating damage to the cargo, torn bags, or wetness as the cargo was being loaded and stated that "[i]t was quite a clean cargo." He also testified that:

> If there had been damaged cargo, my deck officers would have drawn it to the attention of the charterer's representative through either the chief officer or through me. If wet bags had been loaded, whether or not the charterer liked it, they would have been rejected on the point that there would have been a fire hazard.

The stowage was completed on August 11 and Rogers Terminal issued the clean bills of lading showing no exceptions. The district court's finding that the cargo was loaded in an undamaged condition is not clearly erroneous.

■ The M/V GLORIA sailed from New Orleans on August 11 and arrived at Puerto Limon, Costa Rica on August 16. Discharging operations began on August 17 and continued through August 23.

Bill of lading number 7 shows that 64,-383 bags of soybean meal, 100 pounds per bag, or 2,927.696 gross metric tons, were received by the carrier in apparent good order. The cargo covered under bill of lading number 7 was "direct dispatch" cargo. The consignee, Fabrica de Alimentos

Para Animales, requested from Japdeva, the Port Authority in Limon, that it be allowed to receive its cargo directly after discharge. When cargo is sent direct dispatch, a Japdeva "chequeador" stands at shipside and makes notations of cargo damage as it is discharged from the vessel. The bags of soybean meal were not marked to differentiate them by bills of lading; therefore, the first 64,383 bags discharged were allocated to number 7 and were direct-dispatched. The record contains the "checker books" of the two Japdeva chequeadors who inspected these bags. The checker books show 478 wet bags and 966 broken bags with slackage of 14.837 metric tons. As soon as the direct dispatch cargo was discharged, it was placed on rail cars and sent to the consignee's warehouses in San Jose and Cartago, Costa Rica. Mr. George Grainger, an employee of Japdeva who summarizes the tallies of the cargo discharged at Puerto Limon, was in charge of documenting this particular shipment. Mr. Grainger testified by deposition that when cargo is sent direct dispatch, the chequeadors note the state of the cargo received and note amounts wet, torn, or missing. This is always done, he testified, as the cargo is discharged, at shipside.

Appellants presented some evidence suggesting that the chequeadors' tallies might not have been conducted concurrently with discharge of the cargo and thus were not evidence of the condition of the cargo on outturn from the vessel. There was not, however, any direct testimony from the two chequeadors who conducted the direct dispatch tallies. The district court evidently chose to credit the testimony of the deposed Japdeva employee, and the court found that the cargo under bill of lading number 7 was outturned damaged and slack in the amounts listed in the tallies. The "district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City, North Carolina*, —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). We therefore hold that the district court's finding that there were 478 wet bags and a loss of 14.837 metric tons outturned from the vessel under bill of lading number 7 is not clearly erroneous.

After the direct dispatch cargo had been segregated, the cargo carried under bills of lading numbers 1, 2, 3, and 5 was discharged and loaded into closed, covered railroad cars owned by PECOSA, the Costa Rican Railway Corporation. The cargo was transported about 400 meters to a warehouse owned by Japdeva. Unloading of the cars at the warehouse began on August 21 and continued through September 2. The cargo was separated inside the warehouse and a tally was made with exceptions noted in checker books. The final tally and list of exceptions was prepared on September 5, 1980. The cargo damage noted at the warehouse showed that out of the cargo carried under bills of lading 1, 2, 3, and 5, there were 2,085 bags wet and 360 broken bags with 7.815 metric tons of slack.

On the second day of discharging, August 18, the master of the GLORIA received a report that some of the bags of soybean meal were wet. He went down into the hold to examine the cargo and noticed that some of the bags were stained and contained a thin layer of crust. The master testified by deposition that it was his opinion that the stain came from inside the bags; he could not, however, explain how he could discern that the stain came from inside the bags rather than from the outside. The captain then notified the ship's underwriter who arranged to have a surveyor come to the vessel. On August 20, the vessel interests' surveyor came to the GLORIA and inspected the cargo that remained on board. The appellants have not produced the report resulting from this survey.

Windedd Flemmings, the Japdeva storekeeper who tallied the non-direct dispatch cargo in the warehouse, noticed on August 21, when the first bags were unloaded in the warehouse, that wet bags were being unloaded. Flemmings went to the ship to request that wet and dry bags not be mixed together. He then went aboard the vessel and looked into the holds where he

saw wet bags in the middle of the stow and wet, hard, dark-stained bags in the bottom of the stow.

After examining all of the evidence the district court found that the Japdeva tallies were accurate and that the damage disclosed by the tallies occurred prior to discharge from the vessel.

 Appellants argue that the district court erred by relying on the warehouse tallies since they were not conducted concurrently with discharge and thus are not evidence of the condition of the cargo when outturned. We review the district court's determination of where the damage occurred under the clearly erroneous standard. *Harbert International Establishment v. Power Shipping,* 635 F.2d 370, 374 (5th Cir.1981). In the absence of countervailing evidence the district court was justified in concluding that the damage assessment made in the warehouse reflected the condition of the cargo as it left the vessel. An immediate on-dock inspection is not essential to prove that the cargo has been outturned damaged and short so long as the inspection takes place without a significant time lag. *See Socony Mobil Oil,* 559 F.2d at 1010–12 (where cargo of fuel oil was discharged from vessel into covered tanks and there was no evidence of water preexisting in the tanks, district court could rely on discovery of water contamination of fuel oil two days after discharge to conclude that water was introduced prior to discharge); *Tuteur & Co., Inc. v. The Ittersum,* 162 F.Supp. 788 (E.D.La.1958), *affirmed,* 267 F.2d 310 (5th Cir.1959) (District court relied on tally of cargo as evidence of condition at discharge even though tally was conducted over a week after cargo discharged and after cargo had been placed in rail cars and transported seven miles). In the instant case the court's finding that the cargo was damaged prior to discharge is also supported by the direct testimony of the Japdeva storekeeper who looked at the cargo while it was still aboard the vessel and of the master himself who saw damaged bags aboard the vessel. Moreover, appellants have presented only speculation

as to any alternate cause of the damage. For example, the cargo under bills of lading 1, 2, 3, and 5 sat in rail cars for several days before being unloaded and tallied in the Japdeva warehouse. Appellants contend that the rail cars could have leaked, thus causing damage to the sacks. Appellants, however, have produced no evidence the rail cars used to transport the cargo to the warehouse were damaged or leaked. On the other hand, Mr. Flemming, the Japdeva storekeeper, testified that the rail cars used to transport soybean do not leak and are in good condition. Appellants have also failed to offer any evidence that the warehouse tallies were inaccurate. The district court's finding that the cargo under bills of lading 1, 2, 3, and 5 was discharged damaged and slack is not clearly erroneous.

*Liability for Shortlanded Bags*

 The Japdeva tallies disclosed that 1161 bags were shortlanded from the vessel. Since the direct dispatch cargo was discharged in full prior to the discharge of the rest of the cargo, there was no shortage in the cargo carried under bill of lading number 7. All of the shortage is claimed on the cargo under bills of lading 1, 2, 3, and 5. The number of shortlanded bags was determined by subtracting the number of bags received at the warehouse from the manifested quantity. Appellants presented no evidence impugning the Japdeva tally or otherwise accounting for the missing bags; we therefore hold that the district court's finding that 1161 bags were shortlanded is not clearly erroneous.

The district court held that the bills of lading were *prima facie* evidence of receipt by the carriers of the cargo in the quantities stated thereon and that appellants did not overcome the *prima facie* effect of the bills of lading. *See* 46 U.S.C. § 1303(4). Appellants contend that this was error and that appellants should not be liable for any shortlanded bags since, under 46 U.S.C. § 1303(5), Cargill, the shipper, guaranteed the accuracy of the count.

 Innocent transferees of the bills of lading are entitled to benefit from

the bills' *prima facie* effect. *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1373 (5th Cir.1979). As between appellants and the Costa Rican consignees and receivers who held the bills of lading at the discharge port and their subrogee, the bills were entitled to their *prima facie* effect. The district court found that appellants failed to overcome the *prima facie* effect. The court did not err in entering judgment in favor of Pacific Employers Insurance and the Costa Rican plaintiffs for the value of the shortlanded bags. Appellants argue that they should not be liable to Cargill for the shortlanded bags because Cargill, as shipper, is deemed to have guaranteed the accuracy of the quantities as stated on the bills of lading. We do not agree. COGSA Section 1303(s) states, in part, that: "The shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight, *as furnished by him.*" (emphasis added). Although Cargill was the shipper, the bag count was not "furnished by him." The count was not made until after the soybean was bagged in New Orleans, and apparently, Rogers Terminal provided the count. Rogers Terminal provided stevedoring services in New Orleans and was responsible for bagging, clerking, tallying, and stowing the cargo. The district court found it unnecessary to decide whether Rogers Terminal was acting on TMM or Greenwich's behalf in providing stevedoring services. We also need not decide this issue because in neither case would the "shipper," Cargill, have provided the count. Cargill is therefore entitled to benefit from the *prima facie* effect of the quantities stated on the bills of lading. Since the appellants failed to produce evidence showing that such quantities were not received the district court's judgment in favor of Cargill was not in error.

Finally, appellants contend that they may not be cast in judgment because the appellees failed to prove where and how the damage and loss occurred. The district court held that appellees established their *prima facie* case of liability under COGSA and that appellants failed to

come forward with sufficient evidence to exonerate themselves from liability or to establish one of the statutory defenses. The court concluded that although "[t]he exact cause of the damaged cargo remains a mystery," the appellants were liable under COGSA. Except to the extent that Cargill is not entitled to recover the value of the shortlanded bags, we affirm. Any doubts as to the cause of the loss must be resolved against the carrier. *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 720 (1st Cir.1984). In *Quaker Oats Co. v. M/V TORVANGER*, 734 F.2d 238 (5th Cir.1984), this court stated:

> [T]he district court found that "no one knows what caused the cargo to form peroxide in the way it did" (R.14) and indeed concluded that the cause of the damage was a "mystery" (R.12).
>
> To rebut the presumption of fault when relying upon its own reasonable care, the carrier must further prove that the damage was caused by something other than its own negligence. [citations] Once the shipper establishes a prima facie case, under "the policy of the law" the carrier must "explain what took place or suffer the consequences." *Compagnie De Navigation, etc. v. Mondial United Corporation*, 316 F.2d 163, 170 (5th Cir.1963); ... "[T]he law casts upon [the carrier] the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability." *The Vallescura*, 293 U.S. 296, 303, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934).

*Id.* at 243. The fact that the exact cause of the damage, shortage, and slackage was not proved does not preclude liability on the part of appellants.

## IV. DISMISSAL OF CLAIMS AGAINST GREENWICH

Pursuant to Federal Rule of Civil Procedure 14(c), appellants tendered Greenwich to the plaintiffs as a party defendant to the main demand. Aquarius and TMM also brought third-party claims for contribution and indemnity against Greenwich. Green-

wich moved for a stay of all of the claims against it. The district court granted the stay only as to the claims of TMM for indemnity and contribution. The stay was granted pending arbitration in New York pursuant to an arbitration clause in the voyage charter party. The stay was denied as to all other claims. In its amended judgment the district court dismissed all of the claims against Greenwich. Defendants appeal the dismissal of each claim.

Appellants argue that their demand that there be judgment in favor of one or more of the plaintiffs and against Greenwich should not have been dismissed. The argument is based solely on appellants' claim that Greenwich is a COGSA carrier. Since the district court's finding that Greenwich was not a carrier is not clearly erroneous, it was not error to dismiss the claim.

■ We agree with appellants that the district court erred by dismissing TMM's claims for indemnity and contribution. These claims were stayed pending arbitration and the stay had not been lifted. We vacate the judgment of dismissal of TMM's third-party claims against Greenwich.

■ Aquarius' third-party claims were not stayed. Since there was no contractual privity between Aquarius and Greenwich, Aquarius' claims must be based on the negligence or actual fault of Greenwich. By stipulation, the parties submitted the entire case to the court on written briefs, depositions, and other documentary evidence in the record. That record contains *no* affirmative evidence of fault on the part of Greenwich. Since Aquarius failed to present any evidence in support of its claims, it was not error for the district court to dismiss.

## CONCLUSION

For the above-stated reasons, we VACATE the *in rem* judgment against the M/V GLORIA and we VACATE the judgment of dismissal in favor of third-party defendant Greenwich and against TMM. In all other respects, we AFFIRM the judg-ment and amended judgment of the district court.