**ASSOCIATED METALS & MINERALS CORPORATION**

v.

**M/V LOTILA, et al.**

**Civ. A. No. 92–6292.**

United States District Court, E.D. Pennsylvania.

Dec. 23, 1993.

Jeffrey S. Moller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for plaintiff.

Matthew P. Harrington, Kathleen M. Daly, Rawle & Henderson, Philadelphia, PA, for defendants.

## *MEMORANDUM*

DALZELL, District Judge.

This admiralty action seeks to recover for damage allegedly caused to a large quantity of steel coils that were shipped from Finland to the United States in the winter of 1991–1992. After a trial *de novo* was demanded following an arbitration held pursuant to this court's statutorily-authorized mandatory program,[1] we conducted a non-jury trial on December 20 and 21.

---

1. In accordance with 28 U.S.C. §§ 651–658, as recently amended, this Court has, by Local Rule of Civil Procedure 8, adopted mandatory court-annexed arbitration involving claims of under

This Memorandum will constitute our Fed. R.Civ.P. 52(a) findings of fact and conclusions of law.

*Background*

Many of the facts necessary to resolve this dispute are undisputed and set forth in ¶¶ 1 through 20 of the parties' pretrial stipulation.

Plaintiff Associated Metals & Minerals Corp. ("Asoma"), based in White Plains, New York, is in the business of importing steel and other metal products for sale in the United States. Defendant FCRS Shipping Limited is a corporation, apparently organized under the laws of the Cayman Islands, with an office in Helsinki, Finland. FCRS owns and operates the defendant motor vessel *Lotila*. The *Lotila*, built in 1977, is a modern, 500–foot bulk cargo carrier equipped with mechanical ventilation and dehumidification systems that make it well-suited for the ocean transport of steel and paper.

In November of 1991, Asoma arranged the purchase of a large quantity of cold rolled steel products from a Finnish steel mill. The steel coils were shipped from the mill aboard covered rail cars to a marine terminal at Naantali, Finland.

Asoma retained the services of Jukka Suksi, who testified at the trial and was qualified as an expert in the packaging, handling and ocean transport of steel. Suksi conducted a survey of the cargo in Finland on December 10, 1991, and stated his uncontradicted opinion that the Finnish mill had properly packaged the cold rolled steel, and that the steel in question was in "prime, new and very good condition."

While it is true that the *Lotila*'s Master stated on the relevant bills of lading that the coils were "slightly damp due to condensation", Suksi testified that such a condition is "not anything remarkable" in Finland at that time of year [2] and that, more importantly, the *Lotila*'s "modern dehumidifiers could easily handle this quantity of condensation." Indeed, after viewing photographs of the coils after they were unloaded in the United States, Suksi expressed the opinion that the dehumidifiers had "not been used" and, further, that the *Lotila*'s "Master and Chief Officer ... did not take proper care of this cargo."

The *Lotila*'s sometimes rough voyage across the North Atlantic in late December concluded with its arrival in New Haven, Connecticut on or about January 3, 1992. Because of a mishap involving water from the ship's swimming pool, a great deal of damage was done to paper cargo in the second hold of the ship (the steel coils were stored in the third cargo hold). Consequently, the *Lotila* was welcomed in New Haven by surveyors not only for consignees, but also for the *Lotila* itself. According to Arthur Kittelsen, the *Lotila*'s surveyor, the paper cargo represented a large loss.

Also in New Haven on January 3 was Hugh Fowley, Asoma's surveyor. Although Kittelsen would not allow Fowley to go into cargo hold number 3, Fowley was able to notice imperfections in the gasket on the cargo hatch of the hold. Of particular note to Fowley were white "run down lines" along the coaming from China clay that had been transported on the *Lotila*'s previous voyage.

Unlike Kittelsen, Fowley followed the *Lotila* to its eventual unloading in Wilmington, Delaware, after paper had been unloaded in Philadelphia. When Fowley inspected the unloaded steel coils, he saw "much white rust and patterns of China clay" on the coils. Fowley expressed his expert opinion, which we credit, that there had been an entrance of water into the cargo hold, which raised the humidity in the cargo hold, thereby causing "ship's sweat." This condensation carried the China clay down onto some, but by no means all, of the many steel coils stored in the cargo hold.[3]

---

$100,000 such as this one. Pursuant to 28 U.S.C. § 1333, we have exclusive jurisdiction regardless of the amount in controversy.

**2.** On the day of Suksi's survey, the temperature was around freezing but the weather was "calm."

**3.** Cargo hold number three is a cavern in this ship, measuring 32 by 16.2 meters. The stowage plan revealed that 372 cold rolled and galvanized coils were stowed in this hold, with each coil weighing approximately 19,000 pounds.

At this point, Asoma had a difficult business decision to make. Fowley testified that there was clearly a problem of "run downs" of water on the coils, but the extent of any damage was difficult to discern on the pier because the coils were packaged and wound. Specifically, the steel coils were wrapped in kraft paper and plastic and, in turn, encased in metal collars called "o.d. wasters". It was undisputed at trial that if the coils were opened in an unheated place in early January, when they arrived in Wilmington, this "could destroy the coils" because condensation would start forming, leading to inevitable rust on all of the metal.

Asoma therefore decided to release the forty-five coils to their customer, Midwest Metal Company, which, in turn, sold thirty-four of them to the manufacturing plant of Kardex Systems, Inc., in Merietta, Ohio. Midwest had the other coils delivered to a heated warehouse in Baltimore, Maryland maintained by Alert Trucking Co. As feared, Asoma on January 21 learned that Kardex had only opened five of the ten-ton coils and had detected damage. As a result, Fowley on January 22 went to the warehouse in Baltimore for an inspection. He also on January 28 visited Kardex, where he found certain coils damaged through the improper "tarping" by Alert Trucking.[4]

After notifying the *Lotila*'s insurer, Transport Mutual, of the possible loss, Fowley caused the eleven coils in Baltimore to be shipped to a processing company in Camden, New Jersey, where a joint survey could take place. Fowley also suggested that a joint survey take place at Kardex, but the ship's surveyor, Kittelsen, declined this invitation. At the Camden processing plant, three of the coils were "decanned" and fully unwound, inspected and rewound. This kind of sampling is in accordance with well-established surveyor practices.

Based upon the joint survey, Fowley prepared a meticulous claim for the damaged coils (Plaintiff's Exhibit 7). The parties have

stipulated that the total claim presented to the ship's agent on September 3, 1992 was $39,830.55. This suit was filed on November 2, 1992.

*Legal Analysis*

The parties agree that this case is governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* Pursuant to sections 3 and 4 of COGSA, 46 U.S.C. §§ 1303 and 1304, "a shipper seeking to recover from a sea carrier for damage to cargo bears the initial burden of proving that the cargo was delivered to the carrier in good condition and outturned in a damaged state." *M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1109 (2d Cir.) (citations omitted), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985). If the shipper makes such a *prima facie* case, "the burden shifts to the carrier to show that the cause of the damage fell within one of" COGSA's exceptions set forth in 46 U.S.C. § 1304(2). *Id.* at 1110, citing Second Circuit authority, all of which we regard as persuasive.[5]

There seems to be little question that Asoma made its *prima facie* case. We credit Suksi's testimony that the coils in question were in "prime, new and very good condition" when they were loaded into cargo hold number 3 in Naantali, Finland. Although there was little evidence of a problem with the coils when the *Lotila* arrived in New Haven, we find Fowley's description of what he saw at the unloading in Wilmington, Delaware, to be entirely credible. Indeed, only Fowley saw the coils in Wilmington, Baltimore, Merietta, Ohio and at the joint survey in Camden, New Jersey. We credit his testimony that the condition of the coils was unchanged from the time of unloading in Wilmington to the time of the joint survey in Camden.[6]

We were most impressed with Fowley's painstaking analysis of the coils described in both his testimony and in his report to Aso-

---

4. These coils are not involved in this claim.

5. We have found no authority from our Court of Appeals on these points.

6. The defendants did not seriously dispute Fowley's testimony that the warehouses of Alert Trucking and Kardex were heated. They did, however, ask us to make inferences about shipping within the United States that are without support in this record.

ma. Contrary to the testimony of Kittelsen, who did not see the coils in Wilmington, Fowley testified that the fresh water that caused the rust on the subject coils came from the outside and seeped inside the coils, and not *vice versa*, as Kittelsen opined. Fowley points out that Kardex was able to use all but the first 1500 pounds of some of the damaged coils, and this is persuasive evidence in our view that the damage was on the outer circles of steel and not the inner ones, as Kittelsen's theory would require. We therefore agree with Fowley that the likely cause was some failure of the *Lotila* dehumidifying system between New Haven, Connecticut and Wilmington, Delaware.

■ As noted, however, COGSA does not require the shipper to prove what, precisely, the carrier's negligence was. If, as here, the shipper shows cargo in good condition loaded on, and in bad condition loaded off, the burden shifts to the carrier to assert COGSA-recognized defenses. Defendants did not begin to carry such a burden, since it called no witness from that ill-starred voyage of the *Lotila.*

■ Defendants made reference in their pretrial submissions and at trial to the three-day notice provision of § 3(6) of COGSA, 46 U.S.C. § 1303(6).[7] Where, however, as here the shipper comes forward with sufficient evidence to suggest damage to the cargo, "the presumption [of non-damage] disappear[s] and the evidence of lack of notice 'is accorded no special weight beyond that given other evidence concerning where the damage occurred.'" *Pacific Employers Ins. Co. v.*

*M/V Gloria,* 767 F.2d 229, 238 (5th Cir.1985) (citation omitted).

■ Defense counsel did not disagree with our observation during her closing argument that Asoma and Fowley made a rational judgment at pierside in Wilmington not to notify the carrier of the possibility of damage. First, decanning all the coils in Wilmington subjected the coils to further damage. Second, had Asoma's customer been notified of the delay because of concerns about damage, the customer might well have rejected the entire shipment. Indeed, by allowing the ultimate customer to do the initial appraisal of damage, Asoma mitigated what might have been a claim for $175,997 [8] to the actual base claim of only $27,003.22 set forth in Fowley's August 11, 1992 report. To elevate the three-day notice preference into a bar to recovery would be to allow form to overcome rational business judgment, a result unwarranted under COGSA'S practical maritime regime.[9]

Asoma is therefore entitled to judgment for the full amount of $39,830.55. The parties agree that Pennsylvania's 6% prejudgment interest rate began running on September 3, 1992, and thus one year and 111 days' interest has accrued, or $3,116.60, for a total judgment of $42,947.15.

### JUDGMENT AND ORDER

AND NOW, this 23rd day of December, 1993, after a nonjury trial in this matter and based upon the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) contained in the foregoing Memorandum, it is hereby ORDERED that:

7. In relevant part, this less-than-felicitously-phrased subsection provides:

Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

\* \* \* \* \* \*

In any event the carrier and the ship shall be discharged from all liability in respect of loss

or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: *Provided,* That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

\* \* \* \* \* \*

8. The total sales price to Midwest Metal.

9. Asoma's suit was, in any event, filed well within § 3(6)'s one-year safe harbor.

1. JUDGMENT IS ENTERED in favor of plaintiff and against defendants M/V Lotila and FCRS Shipping Limited in the amount of Forty–Two Thousand Nine Hundred Forty–Seven Dollars and Fifteen Cents ($42,947.15);

2. Plaintiff's claim against John Doe Ship Chartering, Inc., shall be marked WITHDRAWN; and

3. The Clerk shall CLOSE this matter statistically.