ROTHFOS CORPORATION, Plaintiff,

v.

M/V NUEVO LEON her engines, tackle, etc., and Transportacion Maritima Mexicana, S.A. de C.V., Defendants.

No. CIV. A. H–99–0775.

United States District Court,
S.D. Texas.
Houston Division.

April 18, 2000.

Robert Glen Moll, Hill Rivkins and Hayden, Houston, TX, for Rothfos Corporation, plaintiffs.

David R Walker, Royston Rayzor Vickery and Williams, Houston, TX, for M/V Nuevo Leon, her engines, tackle etc, Transportacion Maritima Mexicana SA DE CV, defendants.

### *MEMORANDUM AND ORDER*

ATLAS, District Judge.

Pending before the Court in this admiralty case is Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [Doc. # 15]. Defendant Transportacion Maritima Mexicana, S.A. de C.V. ("TMM") has responded in opposition and other plead-

ings joining issue have been filed.[1] The Court has considered Plaintiff's Motion, Defendant TMM's Response, all matters of record, and the applicable authorities, and concludes that Plaintiff's Motion should be **DENIED.**

## I. *FACTUAL BACKGROUND*

This action is brought pursuant to the Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300–1315 ("COGSA"), and concerns damage to coffee beans owned by Plaintiff Rothfos Corporation ("Rothfos" or "Plaintiff"), the shipper in this case. Defendant Transportacion Maritima Mexicana, S.A. de C.V. ("TMM"), the carrier, agreed to transport approximately 13,000 bags of coffee beans owned by Rothfos, on the Defendant vessel, M/V NUEVO LEON. *See* Bills of Lading (exemplars), Defendant's Response, Exhibit A; Inspection Report by TMM, Plaintiff's Motion, Exhibit 1.

The M/V NUEVO LEON departed Veracruz, Mexico, on February 10, 1998, and arrived in New Orleans, Louisiana, on February 13, 1998. *See* Survey Report No. NYC–23075–DB, at 1 (Plaintiff's Motion, Exhibit 3). The claims and cargo at issue involved the following containers shipped under the specified bills of lading:

Claim # 1 ($53,099.09)
1. Container TEXU 220854–3 (B/L[2] 839)[3]
2. Container MLCU 296204–9 (B/L 841)

3. Container SCZU 746946–0 (B/L 842)
4. Container TEXU 205503–8 (B/L 842)
5. Container CRXU 271320–4 (B/L 843)
6. Container CRXU 238936–9 (B/L 843)
7. Container CRXU 288578 (B/L 843)

Claim # 2 ($8,290.85)
8. Container TRIU 312590 (B/L 838) (stripped Feb. 27, 1998)[4]
9. Container TEXU 205346–2 (B/L 838) (unloaded Mar. 2, 1998)[5]

Claim # 3 ($1,899.73)
10. Container GSTU 281864 (B/L 779) (unloaded Feb. 26, 1998)[6]

The coffee was in good order and condition at the time TMM packed it into the containers. *Id. See generally* Asesortamiento e Inspeccion Martima, S.A. de C.V. Inspection Report, Plaintiff's Motion, Exhibit 1.

The containers were discharged from the vessel to "Terminal B–5," and thereafter moved to a facility of Dupuy Storage and Forwarding Corporation ("Dupuy"), a warehouse, where it was stored. Plaintiff inspected the cargo after it arrived at the Dupuy warehouse.[7] The record does not specify the exact relationship between Dupuy and the parties. Defendant TMM describes Dupuy as "cargo's interest," and Rothfos does not dispute that Dupuy was its agent while the coffee was stored in the Dupuy warehouse.

---

1. *See* Defendant Transportacion Maritima Mexicana, S.A. de C.V.'s Response to Plaintiff's Motion for Summary Judgment ("TMM's Response") [Doc. # 18]. Also filed and considered by the Court are Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment [Doc. # 19], Defendants' Sur–Reply to Plaintiff's Reply [Doc. # 21], and Plaintiff's Objection to the Filing of Defendants' Sur–Reply [Doc. # 22]. Plaintiff has moved to strike the Sur–Reply. *See* Doc. # 22. This Motion is DENIED.

2. "B/L" followed by a number refers to the bill of lading for the specified container.

3. *See* Survey Report No. NYC–23075–DB, at 1, Plaintiff's Exhibit 3 (dates of survey: March 12 and 17, 1998).

4. *See* Survey Report No. NYC–23063–DB, at 1, Plaintiff's Exhibit 3 (date of survey: March 9, 1998).

5. *Id.*

6. *See* Survey Report No. NYC–23062–DB, at 1, Plaintiff's Exhibit 3 (date of survey: March 9, 1998).

7. It appears that the cargo was moved from Terminal B–5 to the Dupuy Warehouse on or after February 26, 1998. *See* Defendant's Response, at 4.

Three of the containers were stripped or unloaded on February 27, 1998 and March 2, 1998. *See* Survey Report No. NYC–23062–DB, at 1, and Survey Report No. NYC 23063–DB, at 1 (each in Plaintiff's Motion, Exhibit 3). Plaintiff claims that part of the cargo in these three containers was damaged by water. *See id.* Plaintiff prepared and apparently forwarded its claims for this damage on March 5, 1998. *See* Defendant's Response, Exhibit B ("Claim 2" and "Claim 3," respectively).

Plaintiff Rothfos arranged for a marine surveyor, Captain Wolfgang Morgenstern, to survey the damage in these three containers. Morgenstern concluded after inspection of the cargo on March 9, 1998, that numerous bags of coffee from Containers TRIU 312590, TEXU 205346–2, and GTSU 281864 were, "wet stained in irregular patterns," partially dried out, and/or had signs of mildew. Survey Report Nos. NYC–23062–DB, at 2, and NYC–23063–DB, at 2 (Plaintiff's Motion, Exhibit 3).

Thereafter, TMM arranged for a survey which was conducted on March 18, 1998. That survey reported that some of the cargo was damaged. Cargo Survey Report No. NOLC 98–0007, by D.J. Thompson, dated July 7, 1998 ("Thompson Report"). Plaintiff's Motion, Exhibit 2. The parties disagree about the extent of the damage in the containers covered by Claims 2 and 3,[8] about the cause, and whether Plaintiff has met its burden of proof to hold Defendant responsible for the damage.

In addition, the parties have a substantial dispute concerning Claim 1, which is addressed by Plaintiff's surveyor, Morgenstern. *See* Survey Report No. NYC–23075–DB. There is no admissible evidence in the record as to when these containers were unloaded or stripped.[9] Morgenstern reports that his survey was performed on March 12 and 17, 1998. Survey Report No. NYC–23075–DB, at 2 (Plaintiff's Motion, Exhibit 3).[10] Morgenstern noted the following damage:

| Container No. | Bags Damaged | Type of Damage Reported |
|---|---|---|
| TEXU 220854–3 | 26 | Wet stained |
| SCZU 746946–0 | 28 | Wet and partially mildewed |
| CRXU 271320–4 | 30 | Bags were soaking wet and mildewed. Internal inspection of the container revealed that the bottom was wet |
| MLCU 296204–9 | 30 | Wet and mildewed |
| TEXU 205503–8 | 27 | Bottom half wet and discolored |
| CRXU 238936–9 | 34 | Wet and discolored. The bottom of the container was wet stained … and signs of wet mud on the bottom and outside of the container. |
| CRXU 228578 | 30 | Wet |

Morgenstern also reported that all of the damaged bags of coffee had been packed on the bottom layer of their respective containers, and that, as a result of the damage, the FDA ordered that the damaged bags be destroyed. *See id.* According to Morgenstern, the total value of the destroyed coffee was $63,289.67. *See* Affidavit of Captain Wolfgang Morgenstern, Plaintiff's Motion, Exhibit 3.

Plaintiff claims that both Defendants' negligence or vessel unseaworthiness caused water damage to its cargo of coffee beans while the cargo was in Defendants' custody, and that Plaintiff is entitled to

---

**8.** The reports revealed the surveyors' opinions on damages relating to Claims 2 and 3, as follows:

| Container No. | Damage Reported Thompson | Morgenstern |
|---|---|---|
| TRIU 312590 (B/L 838) | 30 bags | 30 bags |
| TEXU 205346–2 (B/L 838) | 2 bags | 6 bags |
| GSTU 2818864 (B/L 779) | 8 bags | 28 bags |

**9.** Defendant submitted documents from Dupuy that indicate the unloading may have been on March 10 and 11, 1998. However, the notes on these documents are not explained, nor submitted with any authenticating affidavit.

**10.** There is no evidence in the record from Defendant or its surveyor, Thompson, as to the scope of the damage to these containers.

recovery of all the damages identified by Morgenstern.

## II. *SUMMARY JUDGMENT STANDARDS*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Boze v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The facts are to be reviewed with all "justifiable inferences" drawn in favor of the party opposing the motion. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir.1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith*, 158 F.3d at 911. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate. *See Morris*, 144 F.3d at 380. This is accomplished by producing "significant probative evidence" that there is an issue of material fact so as to warrant a trial, *see Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir.1996); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994), and that is "sufficient to support a jury verdict." *Morris*, 144 F.3d at 380; *accord Doe v. Dallas Indep. School Dist.*, 153 F.3d 211, 215 (5th Cir.1998). This burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See, e.g., Morris*, 144 F.3d at 380. Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *See id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* Dispute about a material fact is genuine only if evidence is such that reasonable jury could return a verdict for nonmoving party. *See Stafford v. True Temper Sports*, 123 F.3d 291, 294 (5th Cir.1997); *Hanks v. Transcontinental Gas Pipe Line Corp.*, 953 F.2d 996, 997 (5th Cir.1992).

In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir.1995); *Little v. Liquid Air Corp.*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

## III. DISCUSSION

### A. Liability under COGSA

Plaintiff brings this suit under COGSA, 46 U.S.C. app. § 1303. Under this section, a cargo owner may recover damages from the carrier of the goods. *See Thyssen Steel Co. v. M/V Kavo Yerakas,* 50 F.3d 1349, 1351 (5th Cir.1995). To do so, a cargo owner may establish a *prima facie* case of liability in two ways. *See Transatlantic Marine Claims v. M/V "OOCL INSPIRATION",* 137 F.3d 94, 98 (2d Cir.1998) (Calabresi, J.). First, the plaintiff may present direct evidence of the cargo's condition at delivery and at outturn. *Id.* In order to establish a *prima facie* case, the plaintiff bears the initial burden of establishing both delivery of goods to the carrier in good condition and outturn by the shipper in damaged condition. *Id.* A bill of lading is *prima facie* evidence of the receipt of the goods by the carrier in the condition described in the bill of lading. *Id.; see also Pacific Employers Ins. Co. v. M/V GLORIA,* 767 F.2d 229, 239 (5th Cir.1985). A plaintiff, alternatively, may establish a *prima facie* case by demonstrating that "the characteristics of the damage suffered by the goods justify the conclusion that the harm occurred while the goods were in the defendant's custody." *Id.* at 99.

Under the first approach for proof by a shipper of cargo damage caused by a carrier, where the loss or damage is not apparent at delivery, COGSA imposes a three-day notice requirement. *See* 46 U.S.C. app. § 1303(6). Under this provision, a cargo owner is required to give the carrier notice of the alleged loss or damage within three days of delivery of the cargo to the shipper. *Id.* Failure to give "notice of loss or damage and the general nature of such loss or damage ... in writing to the carrier or his agent at the port of discharge' [within three days] of removal of the goods into the custody [of the shipper] ... shall be *prima facie* evidence," which has been referred to as a presumption, "of the delivery by the carrier of the goods as described in the bill of lading." *Id.; Pacific Employers,* 767 F.2d at 238.

The presumption created by § 1303(6) is conclusive, however, "only where there is no other evidence on the disputed point." *Pacific Employers,* 767 F.2d at 238 (quoting *Socony Mobil Oil Co., Inc. v. Texas Coastal & Int'l, Inc.,* 559 F.2d 1008, 1012 (5th Cir.1977)); *see also Bally, Inc. v. M.V. Zim America,* 22 F.3d 65, 71 (2nd Cir. 1994).[11] Once the plaintiff comes forward with sufficient evidence that suggests that the cargo was damaged prior to final delivery, the presumption under § 1303(6) disappears and "the lack of notice 'is accorded no special weight beyond that given other evidence concerning where the damage occurred.'" *Id.* (quoting *Harbert Int'l Establishment v. Power Shipping,* 635 F.2d 370, 373 (5th Cir.1981)).[12]

Once the plaintiff establishes this *prima facie* case, the burden shifts to the carrier to show that one of the COGSA exceptions apply. *Transatlantic Marine,* 137 F.3d at 98 (citing 46 U.S.C.App. § 1304); *see also Pacific Employers,* 767 F.2d at 239. In other words, "the law casts upon [the carrier] the burden of the loss which he cannot explain ...." *Id.* (citing *Associated Metals & Minerals Corp. v. M/V ARKTIS SKY,* 978 F.2d 47, 51 (2d Cir.1992)).

---

11. According to the Court of Appeals for the Second Circuit, the notice provisions· of § 1303(6) do not apply when a plaintiff offers evidence that the characteristics of the damage suffered by the goods indicates that the damage occurred during shipment. *See Transatlantic Marine Claims,* 137 F.3d at 99.

12. In *Pacific Employers,* for example, the plaintiff offered the records of two individuals who inspected the cargo as it was being offloaded from the vessel and who noted that the cargo was damaged. *Id.* at 240. Plaintiff also offered the deposition of the individual in charge of the cargo inspection. *Id.* The appeals court held that this evidence was sufficient to establish a *prima facie* case of damage and that the notice provisions of § 1303(6) were inapplicable.

## B. *Analysis*

Plaintiff Rothfos has not proffered probative admissible evidence that satisfies its summary judgment burden on its *prima facie* case under § 1303. There are material fact questions that require a trial of this case.

 While there is no dispute that Plaintiff's coffee cargo was in good condition at the time Defendant received it in Mexico, Plaintiff has failed to present evidence as to the date Plaintiff removed from TMM's custody each of the containers in issue. Thus, there is a genuine question of fact as to whether the notice provision of COGSA § 1303(6) has been satisfied. Defendant contends that Plaintiff picked up the containers at Terminal B–5 on or about February 26, 1998, and moved them to the Dupuy warehouse. *See* Defendant's Response, at 4, citing Plaintiff's Motion, Exhibit 3 (Morgenstern's Surveys). While there is limited information in Morgenstern's surveys as to his understanding of the delivery, unloading and/or stripping dates of the three containers that are the subject of Claims 2 and 3,[13] there is no admissible evidence as to when Plaintiff actually obtained control of the cargo. There also is no information from Plaintiff as to when the other seven containers (the subject of Claim 1) were unloaded. Thus, there is a question of material fact on material dates concerning all the containers.[14]

 Plaintiff, however, argues that Defendant TMM's obligations between discharge of the cargo from the vessel and cargo delivery to Plaintiff are governed by the Harter Act, 46 U.S.C.App. § 190 *et seq.* Plaintiff contends that delivery is not complete "until the consignee's representative signs an interchange receipt indicating that the cargo has left the custody of the carrier." Plaintiff's Reply, at 5 (citing *Standard Multiwall Bag Mfg. Co. v. Marine Terminals Corp.*, 961 F.Supp. 240, 242 (D.Or.1996)). The Harter Act applies in COGSA § 1303 cases. *See U.N./F.A.O. World Food Programme v. M/V TAY*, 138 F.3d 197, 200 (5th Cir.1998). However, Plaintiff's reading of that Act is not accurate. The Harter Act does not resolve the fact question of date of delivery. "Proper delivery" under the Harter Act requires delivery be made consistent with the custom of the port.[15] If there are peculiar circumstances such that the customary manner of delivery "subjects the cargo to a greater than normal risk for cargo in that particular port," then the delivery is not "proper." *F.J. Walker, Ltd. v. The Motor Vessel "Lemoncore,"* 561 F.2d 1138, 1144 (5th Cir.1977). There is nothing in the summary judgment record that addresses these issues as to any of the containers in issue.

---

**13.** The Morgenstern surveys reveal that Container GSTU 281864 was unloaded on February 26, 1998. Container TRIU 312590 was "stripped" on February 27, 1998; and Container TEXU 205346–2 was unloaded on March 2, 1998. *See* Plaintiff's Motion, Exhibit 3.

**14.** There is also a fact issue as to when Rothfos's claim notices were delivered to Defendants. As to these containers, Plaintiff relies on Morgenstern's Survey Report No. NYC–23075–DB, which does not refer to any unloading dates.

**15.** The carrier must discharge the cargo upon a "fit and customary wharf" so that the cargo is accessible to the consignee and requires that the carrier give the consignee notice of the cargo's arrival and a reasonable opportunity to come and pick it up or place it under proper care. *See, e.g., Metropolitan Wholesale Supply, Inc. v. The M/V ROYAL RAINBOW,* 12 F.3d 58, 61 (5th Cir.1994); *Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 F.3d 734, 741–42 (4th Cir.1993); *See Hillcrest Sales, Inc. v. Chilean Line, Inc., et al.,* 1998 WL 961894, *4 (E.D.Pa.1998). These requirements, which derive from general maritime common law, are "subject to the 'custom of the port doctrine,' which is the 'well settled rule ... that the common law requirements of proper delivery are modified by the custom, regulations, or law of the port of destination ....' " *Servicios–Expoarma, C.A. v. Industrial Maritime Carriers, Inc.,* 135 F.3d 984, 993 (5th Cir.1998) (citations omitted).

■ Plaintiff contends that Defendant's failure to produce the interchange receipts gives rise to an evidentiary presumption that these receipts would support Plaintiff's position. *See* Plaintiff's Reply, at 5 (citing *J. Gerber & Co. v. S. S. Sabine Howaldt*, 437 F.2d 580, 593 (2d Cir. 1971)).[16] The Court disagrees. There appears no reason why documentary proof of delivery by Defendant TMM of the cargo to Plaintiff, or Plaintiff's agent, is not equally available to Plaintiff as to Defendant.[17] Thus, no presumption arises in favor of Plaintiff from Defendant's failure to produce the interchange receipts, and the question remains as to whether the notice provisions of COGSA have been satisfied.[18]

The record evidence fails to resolve other genuine questions of material fact as to the conditions under which the cargo was stored prior to its transfer to Terminal B–5, its storage there, and its storage in the Dupuy warehouse prior to the surveys.[19] This information is material because the cargo was stored at the Dupuy warehouse

for days, if not weeks, before the damage claims were made.

■ In an attempt to prove the damages occurred while the cargo was in Defendant's possession and before Defendant's delivery of the cargo to an agent of Plaintiff, Plaintiff relies on the truth of Dupuy warehouse records that note damage to certain bags within the cargo. *See* unlabeled exhibits to Defendants' Sur–Reply. These Dupuy documents, however, are inadmissible hearsay. There is no evidence that these documents meet the requirements of "business records" under FED. R. EVID. 803(6). Thus, there is no admissible evidence in the record to demonstrate exactly when the inspection or unloading occurred at the Dupuy warehouse or was observed.[20] Information on the location of each damaged bag in the containers at Terminal B–5 and at the Dupuy warehouse is material to an assessment of the time and cause of the water damage claimed by Plaintiff, and is missing from the summary judgment record.

**16.** Plaintiff then argues that the Harder Act requires that the carrier give notice to a shipper of the arrival of the cargo and that "the carrier's liability [is] that of a bailee." *Id.* (citing *Interocean S.S. Corp. v. New Orleans Cold Storage & Warehouse Co.*, 865 F.2d 699, 703 (5th Cir.1989)).

**17.** Interchange receipts may be one possible form of proof, but there is no evidence that they are the only one. Moreover, it is hard to conceive why Plaintiff, or its agent who received delivery of the containers, would not also have a copy of the receipts, if they were issued.

**18.** If one assumes that the Rothfos notices of Claims 2 and 3 were faxed the day they were prepared, i.e., March 5, 1998, then the COGSA § 1303(6), presumption that the cargo was delivered in undamaged condition would apply to the containers delivered on or before March 2. *See* Letters from Joanne Kemp, Rothfos Corporation, to Defendant TMM dated March 5, 1998, Defendants' Response, Exhibit B (two letters). As to the remaining seven containers, Plaintiff has submitted no proof on when Plaintiff gave TMM notice of damage to the coffee cargo. The only evidence before the Court is that Morgenstern

conducted his surveys of that cargo on March 12 and 17, 1998. The Dupuy Container Damage/Shortage Reports are unauthenticated hearsay and thus are not considered by the Court. See unnumbered Attachments to Defendant's Sur–Reply.

**19.** It is also not established by this record whether the Terminal B–5 was an agent of (or location belonging to) Defendant TMM or Plaintiff. There is no evidence how the cargo was moved to the Dupuy warehouse, even if the Court assumes for the purposes of this motion, that Dupuy was in fact an agent of Plaintiff. This in fact is a matter that deserves clarification at trial.

**20.** The reliance by Morgenstern and Thompson on the Dupuy records does not make those records admissible. Each surveyor refers to the Dupuy records to a limited extent. However, neither surveyor establishes that it is common practice for an expert surveyor to rely on such records. Nor does either surveyor explain how he knows when those reports were made. Thus, to the extent that Morgenstern or Thompson rely on the truth of the matters stated in these records, their conclusions appear unreliable.

■ Plaintiff contends that it has proven through the various surveys that the damaged bags were laying on the bottom of their respective containers and were damaged by water, thereby demonstrating that water leaked into the containers while in TMM's custody during or prior to transit. Plaintiff points to Thompson's report, where he states (as to the damage in Claims 2 and 3) that:

At the time of this survey, found the bags described as damaged on pallet boards in the Dupuy Warehouse. Generally, all bags were water damaged on one flat side of the bag. It appears that the bags sat inwater [sic] on the container floor as stated by Dupuy's labor at the warehouse.

Defendants object to the introduction of this survey report on hearsay grounds. *See* Defendant's Response, at 5–6. The survey report was signed by Captain B.J. Thompson, an agent of TMM, a party defendant in this case. To the extent that Defendant objects to statements in the report as to Thompson's non-speculative views, those opinions are admissions by an agent of a party opponent, and are not hearsay under the Federal Rules of Evidence. *See* FED. R. EVID. 801(d)(2).[21]

Plaintiff also relies on the Thompson's Report statement that "from the fact that water damage was only to one flat it appears that these bags were damaged from rising water in the container apparently while on the ground in Veracruz." This statement has little probative value; the reference to events in Veracruz is mere speculation. Thompson's Report, while possibly probative as to his view on the extent of damage to bags of coffee, does not constitute in and of itself *prima facie* evidence that the damage necessarily was caused while the cargo was in Defendant's custody or through fault of Defendant. In his report, Thompson states that he "found the bags described as damaged on pallet boards in the Dupuy Warehouse." Thus, it appears that Thompson did not personally observe the removal of the bags from the various containers, and is relying on others' observations without explaining his professional justification for doing so.[22]

■ Moreover, Thompson's methodology for analyzing the cause of the damage is not established on the current record. The Court cannot conclude at this time that Thompson's procedures for assessing the damage, valuing the loss and determining its cause are reliable and consistent with recognized marine surveyor procedures and standards.[23]

For Claims 2 and 3, respectively, Plaintiff further relies on Morgenstern's conclusory assertions that "the damages occurred while the cargo was in the custody of the ocean carrier and/or it's agents." Survey Report No. NYC–23063–DB, at 3; Survey Report No. NYC–23062–DB, at 2. For Claim 1, Plaintiff points to Morgenstern's general opinion that

Due to the nature of the damage to the coffee, i.e. all bags of bottom layer inside soaked by water ingress *through the bottom*, the FDA ordered those bags to

---

21. The Thompson Report nevertheless has questionable reliability and probative value. First, it is internally inconsistent as to the container it purports to cover. In the space for "Container No.* *: 101," the report refers to TMMU–211454, CRXU–288578, 271320, 238936. The report then refers in space "109," to bills of lading nos. 0837–0838, and 0779. Bills of lading nos. 0838 and 0779 cover containers different from the ones listed in the report at block "101." While the damage information in the chart attached as page 3 of the Thompson Report relates to the containers in bills of lading 0838 and 0779, these containers are different from the containers identified in block "101" of the report.

22. Finally, the Thompson Report only addresses Claims 2 and 3 (and the three out of ten containers in issue). The report thus does not assist Plaintiff on Claim 1.

23. *See infra* for discussion on *Daubert* principles, which apply equally to Thompson as to Morgenstern. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These principles are the basis for the Court's ruling here.

be detained and destroyed under their supervision.

*Id.* (emphasis added). Morgenstern's survey as to Claim 1 also states:

Container CRXU 271320–4: 30 bags were soaking wet and mildewed internal inspection of the container revealed that the bottom was wet.

Container TEXU 205503–8: 27 bags showed bottom half wet and discolored

Container CRXU 238936–9: 34 bags wet and discolored. The bottom of the container was wet stained, reside of Kraft paper was wet and signs of wet mud on the bottom and outside of the container.

Survey Report No. NYC–23075–DB, at 2. However, the notations about the rest of the cargo damage from other containers do not limit the wet bags to the bottom layers.

■ Morgenstern's evidence has serious other deficiencies. The three survey reports are submitted under merely a skeletal supporting affidavit and have not been shown to be reliable as expert testimony. "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise." FED. R. EVID. 702. The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238 (1999).

■ If the trial judge determines that the witness is qualified as an expert in the relevant field, the judge must then pre-screen the expert witness's proffered opinions to ensure that they comply with other requirements of Rule 702 of the Federal Rules of Evidence—that expert testimony is admissible only (1) if it qualifies as scientific, technical or other specialized knowledge and (2) if it will assist the trier of fact to understand the evidence or resolve a disputed factual issue. *Id.* at 1174; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993); *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 989 (5th Cir. 1997). The first inquiry focuses on whether the proffered evidence is scientifically valid and thus sufficiently reliable; the second inquiry is basically a relevance inquiry. *See Daubert,* 509 U.S. at 590–91, 113 S.Ct. 2786; *Tanner v. Westbrook,* 174 F.3d 542 (5th Cir.1999); *Watkins,* 121 F.3d at 989. The burden is on the party offering the expert testimony to establish that it is admissible. *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (*en banc*), *cert. denied,* 526 U.S. 1064, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999).

■ Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. The Court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *See Watkins,* 121 F.3d at 989. *Marcel v. Placid Oil Co.,* 11 F.3d 563, 567 (5th Cir.1994). Four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *Watkins,* 121 F.3d at 989.

The Court must assess also "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *See Tanner v. Westbrook,* 174 F.3d 542, 548 (5th Cir.1999) (quoting *Kumho,* 119 S.Ct. at 1178).

The principles announced in *Daubert* regarding the admission of scientific testimony also apply to technical or specialized expert testimony. *See Black v. Food Lion, Inc.,* 171 F.3d 308, 310 (5th Cir.1999)

(citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999)). In *Kumho,* however, the Supreme Court recognized that "the *Daubert* inquiry is always fact specific, and that the *Daubert* factors may not all apply . . . ." *Food Lion,* 171 F.3d at 310. Rather, the factors considered in *Daubert* "may be used as a starting-point for analysis" of purported non-scientific technical or specialized expert testimony." *Id.* at 311.

■ The Court concludes that Plaintiff has not proven Morgenstern to be a qualified expert witness under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See* Defendants' Response, at 6. Plaintiff has provided no information as to Morgenstern's experience, training or knowledge on technical causation issues pertinent to this case. Morgenstern has not been shown to have expertise on determining causation of cargo damage generally. His employment for a survey company is insufficient to qualify him as an expert on such matters. Plaintiff has not offered proof of Morgenstern's methodology in reaching his conclusions on the extent, causes and value of loss or destruction of coffee bean cargo. Indeed, Morgenstern's testimony on causation lacks recognizable foundation in this summary judgment record.[24] While Plaintiff may be able to cure these deficiencies at trial, the record fails to support Plaintiff's proffer of Morgenstern as an expert *per se.* Morgenstern's opinions are insufficient to satisfy its burden to show that damage to the cargo occurred while the containers and cargo were in Defendant's possession.

Therefore, whether or not Defendant TMM obtains the benefit of the presumption under § 1303(6), the Court concludes that there are genuine fact issues as to the cause of the damage for each of the ten containers of cargo,[25] and the condition of the cargo when delivery by TMM to Plaintiff or its agent.

The Court last concludes that there is a genuine question of material fact as to the extent of Plaintiff's actual damages. Plaintiff has offered evidence through Morgenstern's survey reports that portions of the cargo was to be destroyed by the FDA, and that the damaged, unreconditioned cargo was in fact destroyed. Defendants offer no evidence to contradict the inference that the FDA's order was carried out.

The Court finds, however, that Plaintiff has not provided sufficient evidence concerning the market value of the ruined coffee. Plaintiff again points to Morgenstern's surveys in which he reports that the "invoice/fair market value of the damaged coffee and the costs of sorting and destroying the coffee . . . " total $63,289.67. Plaintiff presents no evidence, however, as to Morgenstern's qualifications to make this damages assessment as to cargo containing coffee beans. There is no evidence regarding Morgenstern's education or employment experience in the field of cargo appraisal generally. The only indication of his suitability to offer an opinion in this case is his own conclusory statement. This is clearly insufficient to establish his expertise under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho*

24. Morgenstern's personal observations of the condition of the bags of coffee beans are arguably not the subject of expert testimony. To the extent he personally observed cargo and saw the location of the damage on each bag, there is no valid *Daubert* objection to his testifying as to the condition of the cargo. However, there is no evidence that he personally saw the containers unloaded. Thus, the record contains no "personal knowledge" basis for his statements that the damaged bags

were on the "bottom layer inside soaked by water ingress through the bottom."

25. There also is a fact question as to whether Thompson was invited to the survey for Claim 1, although the materiality of the issue is not clear. Plaintiff contends on the basis of Morgenstern's Survey Report No. NYC–23075–DB, at 3, that Thompson attended. Thompson, however, has averred in an affidavit that he never was invited and did not attend.

*Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Morgenstern's methodology has not been shown to be reliable either.[26] He does not explain how he reaches damage figures different from Thompson or where he derives the cost figures for the reconditioning, sorting or destruction.[27]

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that Plaintiff's Motion for Summary Judgment [Doc. # 15] should be **DENIED.** It is therefore

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 15] is **DENIED.**

See also 80 F.Supp.2d 707.

---

26. The Thompson and Morgenstern surveys, even if they are assumed to be accurate and prepared by experts with sufficient training in accordance with standard and professional methodologies, are not consistent as to what was destroyed as a result of water damage.

27. The Court does not intend to imply that Morgenstern is or is not an expert on these matters. Plaintiff simply has not met the burden to demonstrate his expertise or the reliability of his methodology.